******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# JOHN MOYE *v.* COMMISSIONER OF CORRECTION
## (AC 47171)

Alvord, Clark and Lavine, Js.

*Syllabus*

The petitioner, who had previously been convicted, following a jury trial, of, inter alia, murder, appealed, on the granting of certification, from the judgment of the habeas court denying his petition for a writ of habeas corpus. He claimed, inter alia, that the court erred in concluding that his criminal trial counsel did not provide ineffective assistance by not retaining a crime scene reconstruction expert. *Held*:

The habeas court correctly determined that the petitioner failed to establish prejudice pursuant to *Strickland* v. *Washington* (466 U.S. 668), as this court's review of the record led it to conclude that any purported error by criminal trial counsel in failing to retain a crime scene reconstruction expert did not establish a reasonable probability that the result of the petitioner's criminal trial would have been different and, thus, the petitioner's ineffective assistance of counsel claim against his criminal trial counsel necessarily failed. As the habeas court correctly determined that the petitioner's criminal trial counsel did not provide ineffective assistance in failing to retain a crime scene reconstruction expert, the petitioner's claim that his counsel in his first habeas action rendered ineffective assistance by failing to challenge the effectiveness of the petitioner's criminal trial counsel on that same claim necessarily failed.

Argued April 21—officially released July 22, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Bhatt, J.*; judgment denying the petition, from which the petitioner, on the granting of certification to appeal, appealed to this court. *Affirmed*.

*Trent A. LaLima*, with whom, on the brief, was *Virginia M. Gillette*, for the appellant (petitioner).

*Nicholas L. Scarlett*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

LAVINE, J. Following the granting of his petition for certification to appeal, the petitioner, John Moye, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court improperly failed to conclude that (1) his criminal trial counsel provided ineffective assistance by not retaining a crime scene reconstruction expert and (2) his prior habeas counsel provided ineffective assistance by failing to raise in a previous habeas action the foregoing claim of ineffective assistance directed at his trial counsel. We affirm the judgment of the habeas court.

The following facts underlying the petitioner's criminal conviction, as reasonably could have been found by the jury, are summarized from the petitioner's direct appeal. See *State* v. *Moye*, 119 Conn. App. 143, 986 A.2d 1134, cert. denied, 297 Conn. 907, 995 A.2d 638 (2010). On the evening of April 30, 2005, Jerry Booker gave a ride to Clarence Jones (victim), Roderick Coleman, and the petitioner. Id., 146. Booker then picked up Tamara Wilson, who was Coleman's girlfriend, Tawana Little, and a third woman named Jada. Id. Booker was the driver, the victim and Jada rode in the front passenger seat, the petitioner sat behind Booker, Little was seated next to the petitioner, and Wilson sat on Coleman's lap behind the front passenger seat. Id.

Booker drove to a nearby gasoline station and he, the victim, and Jada entered the gasoline station. Id. With the two men and Jada out of the car, the petitioner began telling the other passengers about his belief that Booker and the victim planned to rob him. Id., 146–47. He said that he was going to "act up." Id., 147. After the three who had gone into the gasoline station returned to the car, the group left to drop off Jada. Id. As Booker was driving to Jada's house, he answered his ringing

cell phone and handed it to the victim upon realizing that it was the victim's mother calling. Id. The petitioner, who was seated in the backseat, then shot the victim in the head while he was seated in the front passenger seat. Id., 149. The victim's mother heard someone say: "Call 911. He's been shot." Id., 147. The petitioner, holding a gun, ordered everyone out of the car. Id. Booker and Jada exited the car, and the petitioner moved into the driver's seat, pushed the victim's body out of the car, and drove away. Id.

After driving a short distance, the petitioner stopped the car, wiped down the steering wheel and car handles, and exited the car with Little, Wilson, and Coleman. Id. The group got into a taxicab and went to Little's house. Id. Once at Little's house, the petitioner again told the others that he believed that he was going to be robbed and that was why he shot the victim. Id. He told Little that he had tried to shoot the victim in the face and told Little and Wilson that they should "take it to the grave." Id. The petitioner was convicted, following a jury trial, of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes (Rev. to 2005) § 29-35 (a). Id., 145. The judgment of conviction as to those two charges was affirmed on direct appeal.[1] Id., 164.

The petitioner filed a petition for a writ of habeas corpus and, following a trial, the court, *Fuger, J.*, denied the petition. Thereafter, the petitioner's appeal following that denial was dismissed. *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 145 A.3d 362 (2016), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017).

---

[1] The petitioner was also convicted, following a plea of guilty pursuant to *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), of criminal possession of a pistol in violation of General Statutes (Rev. to 2005) § 53a-217c (a) (1). The judgment was reversed as to that conviction on direct appeal. See *State* v. *Moye*, supra, 119 Conn. App. 161–64.

The petitioner filed a second petition for a writ of habeas corpus, and in his operative third amended petition alleged that (1) his trial counsel, Attorney Gary Mastronardi, provided ineffective assistance by not retaining and presenting the testimony of a crime scene reconstruction expert and (2) his first habeas counsel, Attorney April Brodeur, provided ineffective assistance by failing to raise that claim in the first habeas proceeding.

Following a trial, the habeas court, *Bhatt, J.*, issued a memorandum of decision denying the operative petition and, thereafter, granted the petitioner's petition for certification to appeal. This appeal followed. Additional facts and procedural history will be set forth as necessary.

We begin by setting forth our standard of review and the legal principles that govern claims of ineffective assistance of counsel. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). . . . In *Strickland* . . . the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . .

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations omitted; internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, 158 Conn. App. 431, 437–38, 119 A.3d 607 (2015).

I

The petitioner first claims that the court improperly determined that he had failed to satisfy the prejudice prong of *Strickland* with respect to his claim that Mastronardi rendered ineffective assistance by failing to retain a crime scene reconstruction expert.[2] We disagree.

In its memorandum of decision, the habeas court reasoned, when addressing the prejudice prong of *Strickland*, that, although "the court understands the import of the testimony of a crime scene reconstructionist, the court cannot conclude that the evidence presented to it undermines its confidence in the verdict,

---

[2] Because we decide the petitioner's claim on the basis of the prejudice prong, we need not address the petitioner's argument concerning the performance prong. See, e.g., *Crocker* v. *Commissioner of Correction*, 126 Conn. App. 110, 117, 10 A.3d 1079 ("Because both prongs [of *Strickland*] must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . . Accordingly, a court need not determine the deficiency of counsel's performance if consideration of the prejudice prong will be dispositive of the ineffectiveness claim." (Internal quotation marks omitted.)), cert. denied, 300 Conn. 919, 14 A.3d 333 (2011).

especially when there was no expert testimony [on crime scene reconstruction] presented to the jury at the criminal trial by the state; the state's theory did not depend on the precise angle of the gunshot; the jury heard from [the petitioner] that there was a struggle and the evidence presented to this court through [Peter Massey, the petitioner's expert in crime scene reconstruction] is that the bullet hole is consistent with [the petitioner's] version of events—but Massey himself did not reconstruct the scene. . . . It is also important to note that both sides agreed that the only question for the jury was [the petitioner's] intent when the weapon fired. While it is certainly possible that the events occurred as [the petitioner] says they did, the jury already considered that possibility. . . . After deliberating, the jury rejected [the petitioner's] version of events. Massey testified that his report could not speak to [the petitioner's] intent at the time of the shot. It is just as possible to accidentally discharge a weapon during a struggle as it is to intentionally do so. The court has no evidence that [the petitioner's] version of an accidental discharge is the only one possible to the exclusion of all others. Based on the above, the failure to call a crime scene reconstruction expert does not undermine this court's confidence in the verdict, since the court does not believe there is a reasonable likelihood of a different outcome in light of all the evidence presented at both the criminal trial and this habeas trial."

We agree with the habeas court that the petitioner failed to establish prejudice. Our review of the record leads us to conclude that any purported error by Mastronardi in failing to retain a crime scene reconstruction expert did not establish a reasonable probability that the result of the petitioner's criminal trial would have been different. The essential objective of presenting the testimony of a crime scene reconstruction expert would

have been to establish that the gun accidentally was discharged as a result of a struggle and, therefore, the petitioner did not intend to kill the victim.[3] Massey testified at the habeas trial that the petitioner's "recollection [of events] is very possible based on the physical evidence." He clarified: "I can't tell you if they were arguing or not arguing or having a jocular discussion. I just know that based on what [the petitioner] says, his recollection can fit the physical evidence."[4] The habeas court, however, questioned the impact that Massey's testimony would have had on the jury had it been presented at the petitioner's criminal trial, noting that "the evidence presented to this court through Massey is that the bullet hole is consistent with [the petitioner's] version of events—*but Massey himself did not reconstruct the scene.*" (Emphasis added.)

The state did not present expert testimony on crime scene reconstruction, and the state's theory of the case did not depend on the precise position or angle of the gun when it was fired. Nonetheless, Mastronardi elicited testimony on cross-examination of the state's expert, Frank Evangelista, an associate medical examiner, that the barrel of the gun was "touching, almost touching" the victim's skin, the bullet hit the front passenger side window slightly above midrange, and that "[t]here's just too many variables to ever say exactly what position

---

[3] "To establish a violation of § 53a-54a, the crime of murder, the state must prove beyond a reasonable doubt that the defendant, with intent to cause the death of another person . . . cause[d] the death of such person or of a third person. . . . [T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Internal quotation marks omitted.) *State* v. *Moye*, supra, 119 Conn. App. 148.

[4] He further testified that photographic images by the Bridgeport Police Department that reconstructed the scene were misleading because, in those images, the trajectory of the bullet was traced through the vehicle's front passenger window using a straight laser despite the fact that the bullet hit the window at a steep angle. These images, however, were not admitted as exhibits at the petitioner's criminal trial.

the head and the gun were in when this happened. . . . All I can say is that the entrance went in the left side of the head and came out the right side of the ear and based on different positions of the head or positions of how the gun was held, anything that fits this path would be normally consistent with the injury."

The petitioner testified at his criminal trial that, when the victim was talking on Booker's cell phone, he reached up to the side of the front passenger seat and grabbed the gun that the victim had placed in Jada's handbag in order to "get possession of the gun just to be comfortable so nothing [would] happen." The petitioner explained that, as he held the gun at an angle, the victim turned around in his seat and grabbed hold of the gun as the petitioner pulled on it in the opposite direction. The petitioner specified that he did not intentionally pull the trigger and that the shooting was an accident. Mastronardi also elicited testimony from the victim's mother, who testified for the state that, during the phone call with the victim, she heard "moving and shuffling."

Mastronardi argued during closing that "[y]ou know there was a struggle and you got that from . . . the victim's own mother." He further argued to the jury that the position of the bullet hole in the front passenger window supported the defense theory of a struggle followed by an accidental shooting and reasoned that the petitioner had testified that "what caused that gun to go off was him pulling one way and [the victim] pulling this way violently. . . . [T]his was an accident." He noted that Evangelista testified that the barrel of the gun was "close up. It was either touching—it was either touching or it was very, very close to the entry" wound on the victim's head and argued that if the victim did not turn around and engage in a struggle for the gun then "that means [the petitioner would] have to stretch his arm out and who has an arm long enough to get a

gun that close to [the victim] who's sitting all the way over in the front passenger seat? Nobody. It's total nonsense. It does not conform with the physical evidence in this case."

Accordingly, even if Mastronardi had presented testimony similar to Massey's, it is not reasonably likely that the result of the petitioner's criminal trial would have been different because Mastronardi sufficiently had placed before the jury, through the cross-examination of Evangelista, the recross-examination of the victim's mother, the petitioner's own testimony, and Mastronardi's closing argument, the argument that the shooting was an accident that occurred as a result of a struggle between the petitioner and the victim. See *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 102, 52 A.3d 655 (2012) (defense counsel's failure to call expert witness did not prejudice petitioner because trial counsel sufficiently established points essential to theory of defense through cross-examination of state's experts and in closing argument to jury).

Additionally, due to the strength of the state's case, there is not a reasonable probability that the result would have been different even if Mastronardi had presented testimony similar to Massey's.[5] At the petitioner's criminal trial, no occupant in the vehicle at the time of the shooting other than the petitioner testified that a struggle had preceded the shooting. Wilson testified that, while in the car at the gasoline station, the petitioner stated that he was going to "act up" because he thought that Booker and the victim were going to rob

---

[5] Wilson (who testified that she saw the petitioner holding a gun to the victim's head), Booker (who testified that after the shooting he saw the petitioner holding a gun in his hand), and Little (who testified that the petitioner stated that he tried to shoot the victim in the face), all provided testimony indicating that the petitioner intended to shoot the victim. Coleman testified that he was intoxicated and asleep at the time of the shooting. Jada did not testify at the petitioner's criminal trial.

him. She further testified that, once everyone was back in the car, she was talking, turned her head, and saw the petitioner with his arm fully extended, holding a gun at the victim's head as the victim had his back to the petitioner. This is consistent with Evangelista's testimony that, at the time the gun was fired, its barrel made contact with, but was not pressed tightly against, the victim's skin.

Booker, who was the driver, testified that he handed his cell phone to the victim, heard a "bang," turned around in his seat, saw the petitioner holding a gun while looking at him, and heard the petitioner say, "Nobody move." After realizing that the petitioner had shot the victim, Booker ran out of the car. Little testified that she did not see a struggle and that the victim was "[j]ust sittin' there" while the petitioner held a gun in his hand. Little explained that, after the shooting, the petitioner "told everybody to 'get the "f" out of the car,' " and after Booker and Jada exited the car, the petitioner got into the driver's seat, pushed the victim's body out of the front passenger seat, drove a short distance, and then wiped the steering wheel and car handles. Little stated that, later that night, the petitioner explained that he tried to shoot the victim in the face because he believed that the victim was going to rob him, then threatened her and Wilson by telling them to "take it to the grave." Additionally, evidence was also presented at the criminal trial that the police found the petitioner hiding by lying on the seats of several chairs under a table. Accordingly, the evidence adduced at the petitioner's criminal trial concerning the events surrounding the shooting, such as Little's testimony that the petitioner explained that he wanted to shoot the victim in the face, the petitioner having threatened Little and Wilson, and evidence of the petitioner's consciousness of guilt, strongly demonstrate that the petitioner intended to kill the victim.

On the basis of the foregoing, we conclude that the habeas court correctly determined that the petitioner failed to satisfy the prejudice prong under *Strickland*. Accordingly, the petitioner's ineffective assistance of counsel claim against Mastronardi necessarily fails.

II

The petitioner next claims that the court improperly determined that Brodeur did not render ineffective assistance by failing to challenge in the first habeas action the effectiveness of Mastronardi regarding his failure to retain a crime scene reconstruction expert. We disagree.

"[A] petitioner claiming ineffective assistance of habeas counsel on the basis of ineffective assistance of [trial] counsel must essentially satisfy *Strickland* twice: he must prove both (1) that his appointed habeas counsel was ineffective, and (2) that his [trial] counsel was ineffective. . . . We have characterized this burden as presenting a herculean task . . . ." (Citation omitted; internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, supra, 158 Conn. App. 439; see also *Lozada* v. *Warden*, 223 Conn. 834, 613 A.2d 818 (1992).

As we have determined in part I of this opinion, the court properly concluded that Mastronardi did not render ineffective assistance concerning his decision not to retain a crime scene reconstruction expert. Accordingly, the petitioner's claim regarding the failure of Brodeur to raise that claim in his first habeas action necessarily fails.

The judgment is affirmed.

In this opinion the other judges concurred.